IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRENT S. FREY, | ) | CASE NO. 1:13-cv-00352 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Brent S. Frey ("Plaintiff" or "Frey") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his

application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 13.  As explained more fully below, the Court **AFFIRMS** the

Commissioner's decision.

## I.  Procedural History

Frey filed an application for Disability Insurance Benefits ("DIB") on May 18, 2010.  Tr.

108, 118, 173.  He alleged a disability onset date of December 15, 2008. (Tr. 108, 109, 118, 173)

and claimed disability due to back injury; herniated, bulging and degenerative discs L4-5;

arthritis in the back; and sciatica (Tr. 108, 118, 128, 135).  After initial denial by the state agency

(Tr. 108-117, 128-131), and denial upon reconsideration (Tr. 118-127, 135-141), Frey requested

a hearing (Tr. 99-106, 142-143).  On September 30, 2011, Administrative Law Judge Ben

Barnett ("ALJ") conducted an administrative hearing.  Tr. 52-81.

In his October 25, 2011, decision (Tr. 37-51), the ALJ determined that Frey had not been under a disability from December 15, 2008, though December 31, 2010, the date last insured. Tr. 40, 46-47.  Frey requested review of the ALJ's decision by the Appeals Council.  Tr. 35.  On December 21, 2012, the Appeals Council denied Frey's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.     Personal, educational and vocational evidence

Frey was born in 1973.  Tr. 108, 118, 173.  He graduated high school.  Tr. 58, 199.  He lives with his wife and two minor children.  Tr. 64, 221.  Frey worked in the past at a number of different jobs, including as an assembler, decontaminator, construction worker, fire inspector, plating operator, landscape laborer, delivery driver, cleaner/housekeeping, smelter operator, tow motor driver, industrial truck operator, and furnace operator.  Tr. 73-76, 193- 196, 199, 205-215, 232-239, 266-272.

### B.     Medical evidence

#### 1.  Treatment history

Frey's medical records show back problems dating back to 1998.  Tr. 590.  In 2001, Frey had back surgery for his disc problems.  Tr. 367-368.  In 2006, Frey was in a motor vehicle accident which he states caused him additional problems with his back.[1] Tr. 59, 273.  He alleges disability as of December 15, 2008.  Tr. 108, 109, 118, 173.  A July 17, 2009, MRI showed:

> 1.     New central protrusion of the disc at L4-L5 probably slightly extending to right neural foramen measuring about 0.4 cm in AP dimension resulting in moderate central spinal stenosis along with hyerptrophy of ligmentum flavum.

---

[1] The records are not entirely clear as to when Frey was in a motor vehicle accident but it appears that the accident was in 2006.  Tr. 273 (September 25, 2006, medical record reflecting the occurrence of a motor vehicle accident three days prior on September 22, 2006) *cf*. Tr. 589 (September 1, 2011, medical record reflecting the occurrence of a motor vehicle accident in 2003).  In any event, there is no dispute that Frey was in a motor vehicle accident. Following the accident, Frey alleges that his back condition worsened.  Tr. 59.

2

2.      Epidural fibrosis posterior to the disc of the L5-S1 and surrounding the descending nerve root of S1 on the left similar to prior study.

3.      Mild encroachment of bilateral neural foramina at L4-L5 and L5-S1 bulging discs.

Tr. 281-282.  On July 30, 2009, Thomas Anton, M.D., of Neurological Associates, reviewed

Frey's MRI results.  Tr. 372.  He noted that Frey had been doing reasonably well until about four

weeks prior when he experienced a flare up of his lower back pain.  Tr. 372.  Dr. Anton did not

recommend surgical intervention.  Tr. 372.  He recommended low back exercises, prescribed

Nuerontin, and scheduled Frey for an L5 nerve block.  Tr. 372.

On March 1, 2010, Frey underwent another MRI.  Tr. 483.  That MRI showed in part:

L4-L5: There is mild posterior broad-based disk bulging with a superimposed posterior central disk extrusion that combine to compress of the anterior thecal sac with obliteration of the lateral recess.  There is no foraminal narrowing at this level.  Mild facet disease is noted.

L5-S1: There is left laminectomy defect with enhancement at the incision site as well a circumferential enhancement along the left S1 nerve root.  At this level there is posterior central disk protrusion and scar tissue which does not cause significant canal or foraminal stenosis.  Moderate bilateral facet hypertrophy is evident at this level.

IMPRESSION:

Postoperative changes at L5-S1 and degenerative changes at L4-5.

Tr. 484.

On March 17, 2010, Frey met with Dr. Sameh R. Yonan, M.D., of The Cleveland

Clinic's Pain Management Center at Hillcrest Pain Management for a follow up appointment.

Tr. 483.  Frey indicated that his symptoms were persistent and stable.  Tr. 483.  He reported that

his medications were "helping for the most part."  Tr. 483.  His pain intensity was a 6 on a scale

of 0-10.  Tr. 483.  Dr. Yonan advised Frey that he should see Dr. Anton to discuss his MRI and

possible options.  Tr. 485.  On April 14, 2010, Frey saw Dr. Yonan.  Tr. 490.  Dr. Yonan noted that Frey had seen Dr. Anton and Dr. Anton had recommended surgery if Frey obtained no relief from conservative treatment.  Tr. 492.  Dr. Yonan scheduled Frey for three injections.  Tr. 492.  On June 23, 2010, Dr. Yonan indicated that Frey had had his three injections, had been doing well, and there was no plan for surgical intervention at the time.  Tr. 504.

Frey also received treatment at Advanced Comprehensive Pain Management.  During an October 20, 2010, visit with Dr. Sherif Salama, M.D., Frey reported that, following caudal injections, he had about 50% improvement for a 3 week period.  Tr. 558.  He indicated that he was going to be seeing a surgeon, Dr. Furey.  Tr. 557.  During a November 5, 2010, appointment with Dr. Salama, Frey stated that he had seen Dr. Furey.  Tr. 554.  Frey told Dr. Salama that he wanted to schedule another injection block.  Tr. 554.  Dr. Salama ordered a caudal epidural injection.  Tr. 556.  On examination, Frey showed decreased range of motion, severe tenderness at the lower lumbar facet, left leg pain from sitting straight leg raising tests but normal lumbar muscle strength and normal sensation and deep tendon reflexes.  Tr. 555.  Dr. Salama reviewed Frey's medications and indicated that Frey was taking his pain medication as prescribed, the medication was working appropriately and producing no side effects and had improved activity of daily living.  Tr. 556.

### 2.  Medical opinions

Frey was treated for his back problems but no treating physician opinions were offered.  Also, there were no consultative physician opinions.  At the initial determination level and, upon reconsideration, two different state agency reviewing physicians provided their opinions with respect to Frey's physical RFC.

### a.  W. Jerry McCloud, M.D.

As part of the initial determination of Frey's claim, on September 13, 2010, Dr. McCloud completed a physical RFC assessment.  Tr. 113-114.  Dr. McCloud opined that Frey had the following exertional limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and, other than the lift and/or carry restrictions, no limitations for pushing and/or pulling.  Tr. 113.  Dr. McCloud also opined that, due to Frey's back pain, Frey had the following postural limitations: climbing ramps/stairs frequently; never climbing ladders, ropes, and scaffolds; balancing frequently; stooping occasionally; and kneeling, crouching, and crawling frequently.  Tr. 113-114.

### b.  Sarah Long, M.D.

Upon reconsideration of Frey's claim, on December 9, 2010, Dr. Long completed a physical RFC assessment.  Tr. 123-124.  Dr. Long opined that Frey had the following exertional limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and, other than the lift and/or carry restrictions, no limitations for pushing and/or pulling.  Tr. 123.  Dr. McCloud also opined that, due to Frey's back pain, Frey had the following postural limitations: climbing ramps/stairs frequently; never climbing ladders, ropes, and scaffolds; balancing frequently; stooping occasionally; and kneeling, crouching, and crawling frequently.  Tr. 123-124.

**C.      Testimonial evidence**

**1.      Frey's testimony**

Frey was represented and testified at the administrative hearing.  Tr. 57-69, 70-73, 79-80. Frey stated that he was unable to work because of physical impairments.[2]  Tr. 58.  He indicated that, because of his back problems,[3] he has constant pain that radiates from his lower back into his buttocks and hips and through his legs into his feet.   Tr. 59, 61.  Even with pain medication, he stated that he would not be able to sustain work for more than 15 minutes at a time without having to take a break and lie down.  Tr. 59.   He can sit for about 15 or 20 minutes before he has to stand up because of the pain.  Tr. 61.  Likewise, he can stand for about 15 to 20 minutes before he starts to experience pain.  Tr. 62.  He cannot lift, bend, twist or reach.  Tr. 62.  He sometimes uses a cane if he is traveling a far distance.  Tr. 62.

He explained that he had been in a motor vehicle accident.  Tr. 59.   Following his accident, he was advised by his doctor to try a stimulation device at home.  Tr. 62-63.  The device was supposed to help by massaging his muscles.  Tr. 62.  He tried it for about 2-3 weeks but he experienced more pain.   Tr. 62.  According to Frey, ever since the accident, his condition has gotten progressively work.  Tr. 59.   He has not had another surgery but has continued treatment for the pain in his back and legs.  Tr. 59-60.  On a scale of 1 to 10, he rates his daily pain level at an 8.  Tr. 61.

Frey indicated that his MRI results have shown degenerative disc disease, scar tissue, arthritis and disc herniation at the L4-5.  Tr. 60.  He has spoken with two surgeons about the the disc

---

[2] Frey has not had any mental health treatment but noted that sometimes he thought maybe he should.  Tr. 65.

[3] In addition to his back problems, Frey indicated that he has a torn rotator cuff that he said he thought could probably be repaired but, with his insurance, he is not able to get it repaired.  Tr. 64.

herniation and they recommended against surgery and advised him that there was only a 50 percent chance of success.  Tr. 60-61.  There was a period of time where Frey received some injections.  Tr. 80.  He had about 10 nerve injections and the effects of those injections lasted for about 7 to 10 days.  Tr. 80.  Because surgery is not an option, Frey indicated that he "pretty much" just has to live with his condition.  Tr. 61.

For medication, he takes Oxycodone three times each day and Valium at night to help him sleep.  Tr. 63.  Frey stated that the medicine helps a little, it helps him cope.  Tr. 63.  The medicine makes him groggy.  Tr. 63.  He did not take his medicine on the day of the hearing because he was driving and, if he had taken his medication, he would not have been able to drive.  Tr. 63-64.

Frey previously received unemployment compensation benefits but those benefits had stopped about a year or so before the hearing.  Tr. 65-66.  While he was on unemployment, he looked for work but, because he really was not able to work, he was limited in what he could do. Tr. 66.  He was open to taking any type of job because he had to be but, when he talked with employers and when they heard about his back issues, they were not interested in hiring him.  Tr. 66.  In order to receive unemployment compensation, he had to certify that he was ready, willing and able to work.  Tr. 66.  He stated that he applied to a lot of different jobs, including factory jobs and cashier positions at grocery stores and gas stations.  Tr. 66-67.  Frey stated that, even though he was indicating in his disability application that he was unable to work, he would have tried to work because that is the law with respect to unemployment.  Tr. 66-67.  In 2010, he worked for a temporary agency where his job entailed polishing parts all day long.  Tr. 67.  He only worked there about one or two days because he had to sit or stand all day.  Tr. 67.  They

allowed him to change from sitting to standing positions but he was unable to do the job.  Tr. 67.

About every 15 minutes or so, he had to stop and stretch, sit back down or lie down.  Tr. 67.

       **2.**      **Vocational Expert's testimony**

 Vocational Expert ("VE") Deborah Lee testified at the hearing.  Tr. 69-79.  The VE

described Frey's past work and indicated that his past work was performed at various skill and

exertional levels.  Tr. 73-76.  The ALJ proceeded to ask the VE hypothetical questions.  Tr. 76.

In the first hypothetical, the ALJ asked the VE to assume an individual of Frey's age,

education, and work experience who is limited to a full range of light exertional work and

limited to frequent climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds;

occasional stooping; and frequent kneeling, crouching and crawling.  Tr. 76.  The VE indicated

that the described individual could perform Frey's past jobs in housekeeping and assembly work

because they were light demand jobs.[4]  Tr. 76.   The VE indicated that there were also other jobs

in the national economy that the described individual could perform, including (1) cashier, a

light, unskilled position with approximately 15,500 jobs available in Northeast Ohio, 46,400 in

Ohio, and 1,104,000 in the national economy; (2) sales clerk, a light, semi-skilled position with

approximately 52,000 jobs available in Northeast Ohio, 148,000 in Ohio, and 4,400,000 in the

national economy; and (3) security guard, a light, semi-skilled position with approximately

13,000 jobs available in Northeast Ohio, 32,000 in Ohio, and 1,000,000 in the national economy.

Tr. 76-77.

In the second hypothetical, the ALJ asked the VE to assume an individual as described in

the first hypothetical but with the following changes: a sit/stand option defined as allowing the

individual to sit or stand alternatively at will, provided that the individual is not off task more

---

[4] The VE noted that she was unsure how long Frey had held his housekeeping job in 2004.  Tr. 76.

than 10 percent of the work period; and a limitation of simple, routine, repetitive tasks, with no production rate or pace work.  Tr. 77.  The VE indicated that such an individual would be unable to perform Frey's past work but that there would be other jobs within the national economy that the described individual could perform, including (1) the cashier position as described in response to the first hypothetical except, to account for the sit/stand option, the numbers of jobs were reduced to approximately 2,600 jobs available in Northeast Ohio, 8,400 in Ohio, and 270,000 in the national economy; (2) parking lot attendant, a light, unskilled position with approximately 1,100 jobs available in Northeast Ohio, 3,100 in Ohio, and 136,400 in the national economy; and (3) merchandise marker, a light, unskilled position with approximately 2,400 jobs available in Northeast Ohio, 13,400 in Ohio, and 338,700 in the national economy.[5]  Tr. 77-79.

In the third hypothetical, the ALJ asked the VE to assume an individual of the same age, education and work experience as Frey who cannot engage in sedentary exertional work on a regular and consistent basis, meaning that he cannot lift up to 10 pounds occasionally, cannot stand or walk for at least 2 hours in and 8-hour day, and cannot sit for at least 6 hours in an 8-hour day.  Tr. 79.  The VE indicated that there would be no work available in the national economy for the individual described in that hypothetical. Tr. 79.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[5] The VE indicated that the position of order clerk for food and beverage, with approximately 100 jobs in the Cleveland area, 300 in Ohio, and 9,500 in the national economy would be available to the individual described in the second hypothetical but, after hearing the number of available jobs, the ALJ indicated that he was going to exclude the order clerk position.  Tr. 78.

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his October 25, 2011, decision, the ALJ made the following findings:[8]

1.  Frey last met the insured status requirements through December 31, 2010.
    Tr. 42.

2.  Frey did not engage in substantial gainful activity during the period from
    his alleged onset date of December 15, 2008, through his date last insured
    of December 31, 2010.  Tr. 42.

3.  Through the date last insured, Frey had the following severe
    impairments: degenerative disc disease, including protruding and
    displaced discs resulting in encroachment of the neural foramina; spinal
    stenosis; lumbosacral spondylosis; thoracic or lumbosacral neuritis or
    radiculitis; and failed back syndrome.  Tr. 42.  The following
    impairments were non-severe impairments: status-post thrombosed left-
    sided varicoceles, status-post right small finger mallet fracture, status-
    post removal of a neuroendocrine tumor of the abdomen, and torn rotator
    cuff.  Tr. 42-43.

4.  Through the date last insured, Frey did not have an impairment or
    combination of impairments that met or medically equaled the severity of
    one of the listed impairments, including Listing 1.04.  Tr. 43.

5.  Through the date last insured, Frey had the RFC to perform a range of
    light work except that he must be allowed to alternate between sitting and
    standing at-will, provided he is not off-task more than 10 percent of the
    workday.  Additionally, Frey should never climb ladders, ropes, or
    scaffolds but may frequently climb ramps and/or stairs, balance, kneel,
    crouch, or crawl.  He may also occasionally stoop.  Finally, Frey is
    limited to simple, routine, repetitive tasks with no production rate or pace
    work.  Tr. 43-45.

---

[8] The ALJ's findings are summarized.

6.      Through the date last insured, Frey was unable to perform any past relevant work.  Tr. 45.

7.      Frey was born in 1973 and was 37 years old, which is defined as a younger individual age 18-49, on the date last insured.  Tr. 45.

8.      Frey has at least a high school education and is able to communicate in English.  Tr. 45.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 45.

10.     Through the date last insured, considering Frey's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy, including cashier, parking lot attendant, and merchandise marker that he could perform.  Tr. 45-46.

Based on the foregoing, the ALJ determined that Frey had not been under a disability from December 15, 2008, the alleged onset date, through December 31, 2010, the date last insured.  Tr.  46-47.

## V. Parties' Arguments

### A.      Plaintiff's arguments

Plaintiff presents six arguments for the Court's consideration. Doc.15.

Frey's first three arguments relate to the ALJ's RFC finding.  Doc. 15, p. 1.  He asserts that the ALJ did not adequately explain his RFC limitations of (1) occasional stooping; (2) frequent crouching, crawling, or climbing stairs; and (3) being able to tolerate alternating between sitting and standing at will without reclining or lying down and without being off task more than 10 percent of the workday.   Doc. 15, pp. 1, 5-6, Doc. 18, pp. 2-5.  He argues that those RFC limitations are not as restrictive as necessary to account for evidence from his treatment notes that show "clinical findings of limited range of spinal motion and positive straight-leg-raising tests, laboratory MRI studies showing herniated lumbar discs with

encroachment, patient's complaints, and physician's acceptance and treatment of those complaints."  Doc. 15, pp. 1, 5-6, Doc. 18, pp. 2-5.

Frey's next two arguments relate to the ALJ's credibility finding.  Doc. 15, p. 1.  First, Frey argues that the ALJ's credibility finding was erroneous because the ALJ "reasoned backward from the RFC finding to claimant's credibility."  Doc. 15, pp. 1, 6-10, Doc. 18, p. 5.  Second, Frey argues that the ALJ erred in considering Frey's unemployment compensation when assessing Frey's credibility.  Doc. 15, pp. 1, 7-8, Doc. 18, p. 6.

Frey's last argument relates to the ALJ's third hypothetical question posed to the VE.  Doc. 15, pp. 1, 8-9, Tr. 79.  Frey asserts that, despite asking the VE a question about whether there would be work available to a claimant who is unable to engage in sustained work for a full eight-hour day on a regular and consistent basis, the ALJ did not make a finding about how often Frey could not sustain a full eight-hour day.  Doc. 15, pp. 8-9, Doc. 18, p. 6.   Thus, Frey argues that the ALJ erred by raising a result determinative issue but not making a finding with respect to that issue and/or not explaining why the third hypothetical did not apply.  Doc. 15, pp. 8-10, Doc. 18, p. 6.

**B.     Defendant's arguments**

In response, Defendant asserts that the RFC is supported by substantial evidence, including clinical findings showing no disabling impairments, effect of prescription medication, and activities of daily living.  Doc. 16, pp. 6-7.

In response to Frey's arguments regarding the ALJ's credibility determination, the Defendant asserts that the ALJ reasonably concluded that, to the extent that Frey claimed he was totally disabled because of his impairments, Frey was not fully credible.  Doc. 16, pp. 7-9.  The Defendant asserts that the ALJ's credibility determination is supported by inconsistencies

between Frey's reports of a disabling condition and record evidence such as clinical notes and Frey's activities during the relevant time period.  Doc. 16, pp. 7-9.  Defendant also states that, in assessing Frey's credibility, the ALJ did not rely exclusively upon the fact that Frey received unemployment compensation during the relevant time period.  Doc. 16, p. 8.

In response to Frey's argument that the ALJ erred because he did not fully explain why he did not adopt alternative hypotheticals, the Defendant argues that Frey's claim has no merit. Doc. 16, pp. 9-10.  Defendant argues that the focus of assessing VE testimony is on whether the VE testimony upon which an ALJ relies is provided in response to a VE hypothetical that accurately portrays limitations as described in the RFC assessment, not on whether an ALJ has assessed a VE's answers in response to alternate hypotheticals.  Doc. 16, pp. 9-10.   Thus, Defendant asserts that, since the VE hypothetical upon which the ALJ relied accurately portrayed the limitations contained in the RFC assessment, the VE's testimony constituted substantial evidence.  Doc. 16, pp. 9-10.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir.

14

2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

A.    **The RFC is an issue reserved to the Commissioner, is sufficiently explained and is supported by substantial evidence**

The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ is to assess a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a); 404.1546(c); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC").

Frey asserts that the ALJ erred with respect to the RFC because he did not sufficiently explain how he determined that Frey had the RFC to stoop for up to one-third of each workday; crouch, crawl, or climb stairs for up to two-thirds of each workday; or tolerate alternately sitting and standing at will without reclining or lying down, and without being off-task for more than ten percent of the time.  Doc. 15, pp. 1, 5-6, Doc. 18, pp. 2-5.  He argues that the medical evidence and opinions do not support the foregoing limitations and more restrictive limitations were necessary to account for evidence from his treatment notes that show "clinical findings of limited range of spinal motion and positive straight-leg-raising tests, laboratory MRI studies showing herniated lumbar discs with encroachment, patient's complaints, and physician's acceptance and treatment of those complaints."  Doc. 15, pp. 1, 5-6, Doc. 18, pp. 2-5.

The ALJ indicated that the RFC was "supported by the claimant's broad range of daily activities, the opinion evidence of record, and the objective medical evidence."  Tr. 45.  A review of the ALJ's decision confirms that the ALJ reviewed and discussed that evidence and that there is substantial evidence to support the RFC.

The ALJ discussed the medical evidence, including Frey's treatment notes.  The ALJ considered treatment records that he found partially supported Frey's subjective allegations as well as treatment records that he found did not support a finding of disability.  Tr. 44.  For example, he considered Frey's MRI results (Tr. 44 (referencing Tr. 281-281, Exhibit 2F, pp. 2-3 (July 17, 2009 MRI); Tr. 374, Exhibit 5F, p. 3 (March 2010 MRI results)) and treatment records indicating, among other matters, that Frey had restricted range of motion of the lumbar spine (Tr. 44 (referencing Tr. 517, Exhibit 10F, p. 8l; Tr. 555, Exhibit 11F, p. 11)).  However, he also considered treatment records showing among other matters mild tenderness in the low back and improved range of motion (Tr. 44 (referencing Tr. 503, Exhibit 9F, p. 51)) and full muscle strength and normal sensation (Tr. 388, Exhibit 6F, p. 12; Tr. 517, Exhibit 10F, p. 8).

The ALJ also considered reports of Frey's daily activities.  Tr. 44-45.  For example, he considered a 2010 Function Report as well as the fact that, while receiving unemployment compensation, Frey had applied for two jobs each week and indicated his readiness, willingness, and ability to work.  Tr. 44-45.

The ALJ considered the opinion evidence or lack thereof.  For example, he noted that there were no treating of examining physician opinions indicating that Frey was disabled or that he had limitations greater than those contained in the RFC.  Tr. 45.  He also considered and gave moderate weight to the opinions of the two state agency physicians who reviewed the record and offered their opinions with respect to Frey's physical RFC.  Tr. 45.   In considering the opinion

evidence of Dr. McCloud (Tr. 113-114, Exhibit 1A, pp. 6-7) and Dr. Long (Tr. 123-124, Exhibit

3A, pp. 6-7), the ALJ stated:

> The record does contain opinions from State agency medical consultants, who
> each opined that claimant should be limited to a range of light work with the same
> postural limitations as listed above.  (Exhibits 1A, 3A.)  These opinions were
> given after thorough review of the available medical evidence and are generally
> consistent with the weight of evidence.  However, in giving the claimant's hearing
> testimony and alleged medication side effects the benefit of the doubt, I find the
> claimant should also be able to alternate between sitting and standing at will, so
> long as he is not off-task more than 10 percent of the time.  Additionally, due to
> pain and medication side effects, he should be limited to simple, routine, and
> repetitive tasks with no production rate or pace work.  Accordingly, the State
> agency consultants' opinions have been given moderate weight in making the
> above findings.

Tr. 45 (emphasis supplied). The RFC is supported by the opinions of the two state agency

reviewing physicians, one of which was provided on December 9, 2010 (Tr. 124, Dr. Long), a

few weeks prior to Frey's date last insured.  Tr. 45.  The ALJ gave Frey the benefit of the doubt

and limited him even further by providing for an at will sit/stand opinion and simple, routine, and

repetitive tasks with no production rate or pace work.  Tr. 45.

Even though Frey may believe that the medical evidence supports his claim of disability,

the ALJ did not ignore the medical evidence and properly considered it prior to determining

Frey's RFC.  *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ

does not improperly assume the role of a medical expert by assessing the medical and non-

medical evidence before rendering a residual functional capacity finding"). Moreover, the

medical opinion evidence and other evidence of record provide support for the ALJ's RFC

assessment.  Thus, even if there is evidence to support a different conclusion, since substantial

evidence supports the ALJ's RFC assessment, it must be affirmed.  *See Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d at 477 ("the Commissioner's decision cannot be overturned if substantial

evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ").

Accordingly, Frey's RFC argument is without merit and not a basis for reversal or remand.

**B.      The ALJ conducted a proper credibility assessment**

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms. First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 3 (July 2, 1996).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by

substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 F. Appx. 370, 371 (6th Cir. 2011)

(citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Frey's arguments with respect to the ALJ's credibility analysis are twofold.  First, Frey

argues that the ALJ's credibility finding was erroneous because the ALJ "reasoned backward

from the RFC finding to claimant's credibility."  Doc. 15, pp. 1, 6-10, Doc. 18, p. 5.  Second,

Frey argues that the ALJ erred in considering Frey's unemployment compensation when

assessing Frey's credibility.  Doc. 15, pp. 1, 7-8, Doc. 18, p. 6.

With respect to Frey's first argument, he claims that the ALJ's decision is flawed

because, when determining his credibility, the ALJ used "meaningless boilerplate."  Doc. 15, p.

6.  Frey relies upon *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012) and argues that the

following language used by the ALJ in his decision is "backwards" and implies that the ALJ first

determined Frey's ability to work and then determined his credibility:

> The claimant's statements concerning the intensity, persistence and limiting
> effects of these symptoms are not credible to the extent they are inconsistent with
> the above residual functional capacity.

Doc. 15, p. 6 (referencing Tr. 44).

Although the ALJ's decision may include "template" language as part of its credibility

analysis, Plaintiff's reliance upon *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012) is

unpersuasive.  As discussed more fully below, the ALJ explained his credibility determination

and that determination is supported by substantial evidence in the record.  *See Gadke v. Comm'r

of Soc. Sec.*, 2013 WL 5428727, *4-5 (N.D. Ohio Sept. 26, 2013) (affirming the Commissioner's

decision denying benefits and indicating that "[m]ost other district courts in the Sixth Circuit that

have addressed *Bjornson* have agreed that it is basically meaningless for the ALJ to simply state

the boilerplate language without further analysis, but have concluded that the ALJ in their cases

adequately explained the credibility determination — which determination was supported by substantial evidence in the record.")  (internal citations omitted); *see also Jones v. Comm'r of Soc. Sec.*, 2012 WL 5378850, * 7 (S.D. Ohio October 30, 2012) (citing *Williams v. Astrue*, 2012 WL 4364147 (S.D. Ohio September 24, 2012) (because the ALJ had adequately explained his credibility determination and because that credibility determination was supported by substantial evidence the inclusion of "template" language, similar to that used in *Bjornson*, was harmless), *report and recommendation adopted*, 2013 WL 556208 (S.D. Ohio Feb. 12, 2013).

When the ALJ concluded that Frey's allegations as to the severity of his symptoms were not credible to the extent that those statements were inconsistent with the RFC, the ALJ considered medical records partially supporting Frey's allegations but also determined that the weight of the evidence did not support his allegations of disabling conditions.  Tr. 44.  Further, consistent with the Regulations, in assessing the credibility of Frey's allegations, the ALJ considered Frey's medications, including the effectiveness of the medications, and Frey's daily activities.  Tr. 44 (referencing Tr. 503, Exhibit 9F, p. 51 (treatment note reflecting that Frey reported that his medications were "helping for the most part and . . . not having difficulty with his medications."); Tr. 44 (referencing Tr. 220-227, Exhibit 4E (Function Report)).

In assessing Frey's credibility, the ALJ also considered that, while applying for unemployment compensation during the relevant period, Frey attested to his readiness, willingness, and ability to work and applied for two jobs weekly.  Tr. 44 (referencing hearing testimony).  Frey argues that the ALJ improperly considered this evidence when assessing credibility.  Doc. 15, pp. 1, 7-8, Doc. 18, p. 6.  However, the ALJ's consideration of Frey's application for and receipt of unemployment compensation as *a* factor in assessing his credibility was not error.  *See Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 801-802 (6th Cir.

2004) (affirming an ALJ's credibility assessment that considered, among other factors, the fact that the claimant had applied for and received unemployment compensation while also applying for disability benefits for the same period); *see also Bell v. Astrue*, 2013 WL 1352354, * 10-11 (D. Vermont Mar. 6, 2013) *report and recommendation adopted by*, 2013 WL 1352380 (D. Vermont Apr. 3, 2013) (remanding case but relying in part upon *Bowden v. Comm. of Soc. Sec.*, 173 F.3d 854 (6th Cir. 1999) when concluding that "[g]iven . . . the 'inherent inconsistency' between Bell's [a claimant's] receipt of unemployment benefits and claims of disability for the same period, . . . the ALJ did not err in considering this inconsistency as one of many factors relevant to assessing . . . credibility.").

Although Frey disagrees with the ALJ's credibility assessment, the ALJ's analysis was not limited to a single piece of evidence and is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment and whether that determination is supported by substantial evidence.  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 4.  In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 476 (6th Cir. 2003).  The court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the Court finds that the ALJ's credibility analysis regarding the severity of Frey's impairments is supported by substantial evidence.  Accordingly, Frey's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment is without merit.

**C.      The ALJ properly considered the VE testimony and did not err by not making a specific finding about how often Frey could not sustain a full eight-hour day and/or by not explaining why an alternate hypothetical was not adopted**

Frey's last argument relates to the ALJ's third hypothetical question posed to the VE. Doc. 15, pp. 1, 8-9, Tr. 79.  He asserts that, despite asking the VE a question about whether there would be work available to a claimant who is unable to engage in sustained work for a full eight-hour day on a regular and consistent basis, the ALJ did not make a finding about how often Frey could not sustain a full eight-hour day.  Doc. 15, pp. 8-19, Doc. 18, p. 6.   Thus, Frey argues that the ALJ erred by raising a result determinative issue but not making a finding with respect to that issue and/or not explaining why the third hypothetical did not apply.  Doc. 15, pp. 8-10, Doc. 18, p. 6.

Frey's argument is in essence a claim that, because the ALJ asked alternate hypotheticals, the ALJ was bound to adopt the alternate hypothetical or explain why an alternate hypothetical was not adopted.  To the extent that Frey attempts to argue that an ALJ's lack of explanation as to why an alternate hypothetical does not apply is comparable to an ALJ's failure to sufficiently explain the weight provided to a treating physician opinion or a Listing level decision (Doc. 15, pp. 8-9), his argument is unpersuasive.  Moreover, Frey's argument lacks merit because the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a); 404.1546(c).  Further,  "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence . . . [the] [h]ypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted as credible".  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy*

*v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

As discussed above, the ALJ reasonably concluded that Frey's subjective complaints were not as limiting as he alleged and the ALJ's RFC, which limited Frey to a range of light work with certain postural and other limitations, is supported by substantial evidence.  The ALJ relied upon VE testimony in response to the second hypothetical which reasonably accounted for the limitations that the ALJ found credible. Thus, the ALJ's reliance upon the VE testimony was proper and constitutes substantial evidence and Frey's request for reversal or remand because the ALJ did not adopt or make specific findings with respect to an alternate hypothetical posed to the VE is without merit.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  February 6, 2014

Kathleen B. Burke
United States Magistrate Judge